# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEVY GARDENS PARTNERS 2007, LP | * | CIVIL ACTION |
| | * | |
| *Plaintiff* | * | |
| | * | |
| versus | * | |
| | * | 18-769 (JEB) |
| STEVEN TERNER MNUCHIN, Secretary, | * | |
| United States Department of the Treasury | * | |
| | * | |
| *Defendant* | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MOTION AND INCORPORATED MEMORANDUM
### IN SUPPORT OF MOTION FOR LEAVE TO FILE SUR-REPLY

Levy Gardens Partners 2007, LP respectfully moves to file a three (3) page Sur-Reply (i) providing this Court with a summary of the goals behind Dodd-Frank and (ii) commenting on constitutional issues raised by the Commerce and Supremacy Clauses of the United States Constitution not fully addressed in the present pleadings but manifest in the facts *sub judice*.

Clearly, Levy Gardens has no objection to the Secretary of the Treasury filing a rebuttal or in anything that the Court may deem appropriate. The substance of the proposed sur-reply is important to issues that are nationally significant.

Respectfully submitted,

*/s/ Henry L. Klein*
Henry L. Klein (DC Bar LA0003)
844 Baronne Street
New Orleans, LA 70113
(504) 301-3027
henryklein44@gmail.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEVY GARDENS PARTNERS 2007, LP | * | CIVIL ACTION |
| *Plaintiff* | * | |
| versus | * | |
| | * | 18-769 (JEB) |
| STEVEN TERNER MNUCHIN, Secretary, United States Department of the Treasury | * | |
| *Defendant* | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER

Considering the Motion by Levy Gardens to file a three-page Sur-reply,

IT IS ORDERED that the Motion is GRANTED and the Sur-reply is deemed filed.

IT IS FURTHER ORDERED that The Secretary of the Treasury is granted _____ days to respond, if he so desires.

District of Columbia, this _____ day of March, 2019.

_____
**UNITED STATES DISTRICT JUDGE**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEVY GARDENS PARTNERS 2007, LP | * | CIVIL ACTION |
| | * | |
| *Plaintiff* | * | |
| versus | * | |
| | * | 18-769 (JEB) |
| STEVEN TERNER MNUCHIN, Secretary, | * | |
| United States Department of the Treasury | * | |
| | * | |
| *Defendant* | * | |

*****************************************************

### SUR-REPLY BY LEVY GARDENS PARTNERS 2007 LP

Very respectfully, Levy Gardens files the following sur-reply to the reply filed by the Secretary of the Treasury on March 8, 2019, Doc. 35, as follows:

### *LAISSEZ-FAIRE*

For added perspective as to the Congressional intent for the Dodd-Frank Act, we provide an *Executive Summary of Financial Regulatory Reform: A New Foundation*, Exhibit A, published at https://www.treasury.gov/initiatives/wsr/Documents/executive_summary.pdf. Respectfully, the response by Secretary Mnuchin at Doc. 35 was non-responsive. Congress *expected* Treasury to *protect* the consumer, not opt-out. Instead, we have a *laissez faire* approach as to a multi-billion dollar deregulated industry. At page 3 of the Executive Summary, the following is stated:

> "These proposals are the product of broad-ranging individual consultations with members of the President's Working Group on Financial Markets, Members of Congress, academics, consumer and investor advocates, community-based organizations, the business community, and industry and market participants."

The third proposal is instructive and on point herein:

> "*(3) Protect consumers and investors from financial abuse.* To rebuild trust in our markets, we need strong and consistent regulation and supervision of consumer financial services and investment markets. We should base this oversight not on speculation or abstract models, but on actual data about how people make financial decisions. We must promote transparency, simplicity, fairness, accountability and access. We propose...."

### *DECEMBER 13, 2013*

On December 13, 2013, the NAIC's *Title Insurance Risk-Based Capital Subgroup of the Title Insurance Task Force and the Capital Adequacy Task Force* conceded that developing risk-based capital requirements for the title industry was nothing short of **impossible**, Exhibit B. The NAIC Memorandum implored the governing body to grant permission to disband, arguing that "...developing risk-based capital requirements for title insurers is not feasible at this time..."

Actually, the die was cast decades ago.

### *THE COMMERCE AND SUPREMACY CLAUSES*

In one of the NAIC surveys introduced in *Klein v. ALTA* years ago, we provided evidence of across-the-board state **deregulation** of title insurers, Exhibit C. But when the 79th Congress passed the McCarran Ferguson Act, it intended that the states **regulate** "...the business of insurance...", a mandate steeped in federalism concepts[1]. When every state passed laws *exempting* title insurers from the rigors of RBC reporting, each state violated the Commerce and Supremacy Clauses of the United States Constitution. The Commerce Clause of the United States Constitution, Article I § 8, cl. 3 gives Congress "...the power to regulate Commerce....among the several states...", which Congress delegated to the states in 1945, expecting compliance, not circumvention. The Supremacy Clause of the United States Constitution, Article VI is the cornerstone of federalism, providing:

> "This Constitution, and the laws of the United States which shall be made in pursuance thereof....shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding..."

In *Edgar v. MITE Corporation*, 457 U.S. 624 (1982), the United States Supreme Court held that "...a state statute is void to the extent that it actually conflicts with a valid federal statute; and 'a conflict will be found where compliance with both federal and state regulation is a physical impossibility...." Therefore, if a title insurance policy is "...a contract of insurance..." as the industry

---

[1] "The proposed Constitution, therefore, is, in strictness, neither a national nor a federal Constitution, but a composition of both....", *Federalist Paper 39*.

would have millions of innocents believe, then every state statute identified in <u>Exhibit C</u> is VOID as a blatant effort to circumvent McCarran-Ferguson.

Unless, of course, it's not "...insurance...".   Levy Gardens respectfully submits that the DECLARATION sought by <u>*Klein v. ALTA*</u>, <u>*Klein v. Lewis Title*</u> and <u>*Klein v. Mnuchin*</u>, now <u>*Levy Gardens v. Mnuchin*</u> must finally bring this corrupt industry down.

          Respectfully submitted,

          <u>/s/   Henry L. Klein</u>
          Henry L. Klein (D.C. Bar LA0003)
          844 Baronne Street
          New Orleans, LA 70113
          (504) 301-30127
          henryklein44@gmail.com

## CERTIFICATE OF SERVICE

I certify that this pleading has been served on all counsel of record through the Court's electronic filing process this 15th day of March, 2019.

          <u>/s/   Henry L. Klein</u>

**EXECUTIVE SUMMARY OF FINANCIAL REGULATORY REFORM: A NEW FOUNDATION**

**INTRODUCTION**

Over the past two years we have faced the most severe financial crisis since the Great Depression. Americans across the nation are struggling with unemployment, failing businesses, falling home prices, and declining savings. These challenges have forced the government to take extraordinary measures to revive our financial system so that people can access loans to buy a car or home, pay for a child's education, or finance a business.

The roots of this crisis go back decades. Years without a serious economic recession bred complacency among financial intermediaries and investors. Financial challenges such as the near-failure of Long-Term Capital Management and the Asian Financial Crisis had minimal impact on economic growth in the U.S., which bred exaggerated expectations about the resilience of our financial markets and firms. Rising asset prices, particularly in housing, hid weak credit underwriting standards and masked the growing leverage throughout the system.

At some of our most sophisticated financial firms, risk management systems did not keep pace with the complexity of new financial products. The lack of transparency and standards in markets for securitized loans helped to weaken underwriting standards. Market discipline broke down as investors relied excessively on credit rating agencies. Compensation practices throughout the financial services industry rewarded short-term profits at the expense of long-term value.

Households saw significant increases in access to credit, but those gains were overshadowed by pervasive failures in consumer protection, leaving many Americans with obligations that they did not understand and could not afford.

While this crisis had many causes, it is clear now that the government could have done more to prevent many of these problems from growing out of control and threatening the stability of our financial system. Gaps and weaknesses in the supervision and regulation of financial firms presented challenges to our government's ability to monitor, prevent, or address risks as they built up in the system. No regulator saw its job as protecting the economy and financial system as a whole. Existing approaches to bank holding company regulation focused on protecting the subsidiary bank, not on comprehensive regulation of the whole firm. Investment banks were permitted to opt for a different regime under a different regulator, and in doing so, escaped adequate constraints on leverage. Other firms, such as AIG, owned insured depositories, but escaped the strictures of serious holding company regulation because the depositories that they owned were technically not "banks" under relevant law.

We must act now to restore confidence in the integrity of our financial system. The lasting economic damage to ordinary families and businesses is a constant reminder of the urgent need to act to reform our financial regulatory system and put our economy on track to a sustainable recovery. We must build a new foundation for financial regulation and supervision that is simpler and more effectively enforced, that protects consumers and investors, that rewards innovation and that is able to adapt and evolve with changes in the financial market.

In the following pages, we propose reforms to meet five key objectives:



1

*(1) Promote robust supervision and regulation of financial firms.* Financial institutions that are critical to market functioning should be subject to strong oversight. No financial firm that poses a significant risk to the financial system should be unregulated or weakly regulated. We need clear accountability in financial oversight and supervision. We propose:

- A new Financial Services Oversight Council of financial regulators to identify emerging systemic risks and improve interagency cooperation.
- New authority for the Federal Reserve to supervise all firms that could pose a threat to financial stability, even those that do not own banks.
- Stronger capital and other prudential standards for all financial firms, and even higher standards for large, interconnected firms.
- A new National Bank Supervisor to supervise all federally chartered banks.
- Elimination of the federal thrift charter and other loopholes that allowed some depository institutions to avoid bank holding company regulation by the Federal Reserve.
- The registration of advisers of hedge funds and other private pools of capital with the SEC.

*(2) Establish comprehensive supervision of financial markets.* Our major financial markets must be strong enough to withstand both system-wide stress and the failure of one or more large institutions. We propose:

- Enhanced regulation of securitization markets, including new requirements for market transparency, stronger regulation of credit rating agencies, and a requirement that issuers and originators retain a financial interest in securitized loans.
- Comprehensive regulation of all over-the-counter derivatives.
- New authority for the Federal Reserve to oversee payment, clearing, and settlement systems.

*(3) Protect consumers and investors from financial abuse.* To rebuild trust in our markets, we need strong and consistent regulation and supervision of consumer financial services and investment markets. We should base this oversight not on speculation or abstract models, but on actual data about how people make financial decisions. We must promote transparency, simplicity, fairness, accountability, and access. We propose:

- A new Consumer Financial Protection Agency to protect consumers across the financial sector from unfair, deceptive, and abusive practices.
- Stronger regulations to improve the transparency, fairness, and appropriateness of consumer and investor products and services.
- A level playing field and higher standards for providers of consumer financial products and services, whether or not they are part of a bank.

*(4) Provide the government with the tools it needs to manage financial crises.* We need to be sure that the government has the tools it needs to manage crises, if and when they arise, so that we are not left with untenable choices between bailouts and financial collapse. We propose:

2

- A new regime to resolve nonbank financial institutions whose failure could have serious systemic effects.
- Revisions to the Federal Reserve's emergency lending authority to improve accountability.

(5) *Raise international regulatory standards and improve international cooperation.* The challenges we face are not just American challenges, they are global challenges. So, as we work to set high regulatory standards here in the United States, we must ask the world to do the same. We propose:

- International reforms to support our efforts at home, including strengthening the capital framework; improving oversight of global financial markets; coordinating supervision of internationally active firms; and enhancing crisis management tools.

In addition to substantive reforms of the authorities and practices of regulation and supervision, the proposals contained in this report entail a significant restructuring of our regulatory system. We propose the creation of a Financial Services Oversight Council, chaired by Treasury and including the heads of the principal federal financial regulators as members. We also propose the creation of two new agencies. We propose the creation of the Consumer Financial Protection Agency, which will be an independent entity dedicated to consumer protection in credit, savings, and payments markets. We also propose the creation of the National Bank Supervisor, which will be a single agency with separate status in Treasury with responsibility for federally chartered depository institutions. To promote national coordination in the insurance sector, we propose the creation of an Office of National Insurance within Treasury.

Under our proposal, the Federal Reserve and the Federal Deposit Insurance Corporation (FDIC) would maintain their respective roles in the supervision and regulation of state-chartered banks, and the National Credit Union Administration (NCUA) would maintain its authorities with regard to credit unions. The Securities and Exchange Commission (SEC) and Commodity Futures Trading Commission (CFTC) would maintain their current responsibilities and authorities as market regulators, though we propose to harmonize the statutory and regulatory frameworks for futures and securities.

The proposals contained in this report do not represent the complete set of potentially desirable reforms in financial regulation. More can and should be done in the future. We focus here on what is essential: to address the causes of the current crisis, to create a more stable financial system that is fair for consumers, and to help prevent and contain potential crises in the future. *(For a detailed list of recommendations, please see Summary of Recommendations following the Introduction.)*

These proposals are the product of broad-ranging individual consultations with members of the President's Working Group on Financial Markets, Members of Congress, academics, consumer and investor advocates, community-based organizations, the business community, and industry and market participants.

**I. Promote Robust Supervision and Regulation of Financial Firms**

In the years leading up to the current financial crisis, risks built up dangerously in our financial system. Rising asset prices, particularly in housing, concealed a sharp deterioration of underwriting standards for loans. The nation's largest financial firms, already highly leveraged,

became increasingly dependent on unstable sources of short-term funding. In many cases, weaknesses in firms' risk-management systems left them unaware of the aggregate risk exposures on and off their balance sheets. A credit boom accompanied a housing bubble. Taking access to short-term credit for granted, firms did not plan for the potential demands on their liquidity during a crisis. When asset prices started to fall and market liquidity froze, firms were forced to pull back from lending, limiting credit for households and businesses.

Our supervisory framework was not equipped to handle a crisis of this magnitude. To be sure, most of the largest, most interconnected, and most highly leveraged financial firms in the country were subject to some form of supervision and regulation by a federal government agency. But those forms of supervision and regulation proved inadequate and inconsistent.

First, capital and liquidity requirements were simply too low. Regulators did not require firms to hold sufficient capital to cover trading assets, high-risk loans, and off-balance sheet commitments, or to hold increased capital during good times to prepare for bad times. Regulators did not require firms to plan for a scenario in which the availability of liquidity was sharply curtailed.

Second, on a systemic basis, regulators did not take into account the harm that large, interconnected, and highly leveraged institutions could inflict on the financial system and on the economy if they failed.

Third, the responsibility for supervising the consolidated operations of large financial firms was split among various federal agencies. Fragmentation of supervisory responsibility and loopholes in the legal definition of a "bank" allowed owners of banks and other insured depository institutions to shop for the regulator of their choice.

Fourth, investment banks operated with insufficient government oversight. Money market mutual funds were vulnerable to runs. Hedge funds and other private pools of capital operated completely outside of the supervisory framework.

To create a new foundation for the regulation of financial institutions, we will promote more robust and consistent regulatory standards for all financial institutions. Similar financial institutions should face the same supervisory and regulatory standards, with no gaps, loopholes, or opportunities for arbitrage.

We propose the creation of a Financial Services Oversight Council, chaired by Treasury, to help fill gaps in supervision, facilitate coordination of policy and resolution of disputes, and identify emerging risks in firms and market activities. This Council would include the heads of the principal federal financial regulators and would maintain a permanent staff at Treasury.

We propose an evolution in the Federal Reserve's current supervisory authority for BHCs to create a single point of accountability for the consolidated supervision of all companies that own a bank. All large, interconnected firms whose failure could threaten the stability of the system should be subject to consolidated supervision by the Federal Reserve, regardless of whether they own an insured depository institution. These firms should not be able to escape oversight of their risky activities by manipulating their legal structure.

Under our proposals, the largest, most interconnected, and highly leveraged institutions would face stricter prudential regulation than other regulated firms, including higher capital requirements and more robust consolidated supervision. In effect, our proposals would compel these firms to internalize the costs they could impose on society in the event of failure.

## II. Establish Comprehensive Regulation of Financial Markets

The current financial crisis occurred after a long and remarkable period of growth and innovation in our financial markets. New financial instruments allowed credit risks to be spread widely, enabling investors to diversify their portfolios in new ways and enabling banks to shed exposures that had once stayed on their balance sheets. Through securitization, mortgages and other loans could be aggregated with similar loans and sold in tranches to a large and diverse pool of new investors with different risk preferences. Through credit derivatives, banks could transfer much of their credit exposure to third parties without selling the underlying loans. This distribution of risk was widely perceived to reduce systemic risk, to promote efficiency, and to contribute to a better allocation of resources.

However, instead of appropriately distributing risks, this process often concentrated risk in opaque and complex ways. Innovations occurred too rapidly for many financial institutions' risk management systems; for the market infrastructure, which consists of payment, clearing and settlement systems; and for the nation's financial supervisors.

Securitization, by breaking down the traditional relationship between borrowers and lenders, created conflicts of interest that market discipline failed to correct. Loan originators failed to require sufficient documentation of income and ability to pay. Securitizers failed to set high standards for the loans they were willing to buy, encouraging underwriting standards to decline. Investors were overly reliant on credit rating agencies. Credit ratings often failed to accurately describe the risk of rated products. In each case, lack of transparency prevented market participants from understanding the full nature of the risks they were taking.

The build-up of risk in the over-the-counter (OTC) derivatives markets, which were thought to disperse risk to those most able to bear it, became a major source of contagion through the financial sector during the crisis.

We propose to bring the markets for all OTC derivatives and asset-backed securities into a coherent and coordinated regulatory framework that requires transparency and improves market discipline. Our proposal would impose record keeping and reporting requirements on all OTC derivatives. We also propose to strengthen the prudential regulation of all dealers in the OTC derivative markets and to reduce systemic risk in these markets by requiring all standardized OTC derivative transactions to be executed in regulated and transparent venues and cleared through regulated central counterparties.

We propose to enhance the Federal Reserve's authority over market infrastructure to reduce the potential for contagion among financial firms and markets.

Finally, we propose to harmonize the statutory and regulatory regimes for futures and securities. While differences exist between securities and futures markets, many differences in regulation between the markets may no longer be justified. In particular, the growth of derivatives markets and the introduction of new derivative instruments have highlighted the need for addressing gaps and inconsistencies in the regulation of these products by the CFTC and SEC.

## III. Protect Consumers and Investors from Financial Abuse

Prior to the current financial crisis, a number of federal and state regulations were in place to protect consumers against fraud and to promote understanding of financial products like credit cards and mortgages. But as abusive practices spread, particularly in the market for subprime



5

and nontraditional mortgages, our regulatory framework proved inadequate in important ways. Multiple agencies have authority over consumer protection in financial products, but for historical reasons, the supervisory framework for enforcing those regulations had significant gaps and weaknesses. Banking regulators at the state and federal level had a potentially conflicting mission to promote safe and sound banking practices, while other agencies had a clear mission but limited tools and jurisdiction. Most critically in the run-up to the financial crisis, mortgage companies and other firms outside of the purview of bank regulation exploited that lack of clear accountability by selling mortgages and other products that were overly complicated and unsuited to borrowers' financial situation. Banks and thrifts followed suit, with disastrous results for consumers and the financial system.

This year, Congress, the Administration, and financial regulators have taken significant measures to address some of the most obvious inadequacies in our consumer protection framework. But these steps have focused on just two, albeit very important, product markets – credit cards and mortgages. We need comprehensive reform.

For that reason, we propose the creation of a single regulatory agency, a Consumer Financial Protection Agency (CFPA), with the authority and accountability to make sure that consumer protection regulations are written fairly and enforced vigorously. The CFPA should reduce gaps in federal supervision and enforcement; improve coordination with the states; set higher standards for financial intermediaries; and promote consistent regulation of similar products.

Consumer protection is a critical foundation for our financial system. It gives the public confidence that financial markets are fair and enables policy makers and regulators to maintain stability in regulation. Stable regulation, in turn, promotes growth, efficiency, and innovation over the long term. We propose legislative, regulatory, and administrative reforms to promote transparency, simplicity, fairness, accountability, and access in the market for consumer financial products and services.

We also propose new authorities and resources for the Federal Trade Commission to protect consumers in a wide range of areas.

Finally, we propose new authorities for the Securities and Exchange Commission to protect investors, improve disclosure, raise standards, and increase enforcement.

### IV. Provide the Government with the Tools it Needs to Manage Financial Crises

Over the past two years, the financial system has been threatened by the failure or near failure of some of the largest and most interconnected financial firms. Our current system already has strong procedures and expertise for handling the failure of banks, but when a bank holding company or other nonbank financial firm is in severe distress, there are currently only two options: obtain outside capital or file for bankruptcy. During most economic climates, these are suitable options that will not impact greater financial stability.

However, in stressed conditions it may prove difficult for distressed institutions to raise sufficient private capital. Thus, if a large, interconnected bank holding company or other nonbank financial firm nears failure during a financial crisis, there are only two untenable options: obtain emergency funding from the US government as in the case of AIG, or file for bankruptcy as in the case of Lehman Brothers. Neither of these options is acceptable for managing the resolution of the firm efficiently and effectively in a manner that limits the systemic risk with the least cost to the taxpayer.

We propose a new authority, modeled on the existing authority of the FDIC, that should allow the government to address the potential failure of a bank holding company or other nonbank financial firm when the stability of the financial system is at risk.

In order to improve accountability in the use of other crisis tools, we also propose that the Federal Reserve Board receive prior written approval from the Secretary of the Treasury for emergency lending under its "unusual and exigent circumstances" authority.

**V. Raise International Regulatory Standards and Improve International Cooperation**

As we have witnessed during this crisis, financial stress can spread easily and quickly across national boundaries. Yet, regulation is still set largely in a national context. Without consistent supervision and regulation, financial institutions will tend to move their activities to jurisdictions with looser standards, creating a race to the bottom and intensifying systemic risk for the entire global financial system.

The United States is playing a strong leadership role in efforts to coordinate international financial policy through the G-20, the Financial Stability Board, and the Basel Committee on Banking Supervision. We will use our leadership position in the international community to promote initiatives compatible with the domestic regulatory reforms described in this report.

We will focus on reaching international consensus on four core issues: regulatory capital standards; oversight of global financial markets; supervision of internationally active financial firms; and crisis prevention and management.

At the April 2009 London Summit, the G-20 Leaders issued an eight-part declaration outlining a comprehensive plan for financial regulatory reform.

The domestic regulatory reform initiatives outlined in this report are consistent with the international commitments the United States has undertaken as part of the G-20 process, and we propose stronger regulatory standards in a number of areas.

Attachment Two-A
Title Insurance (C) Task Force
12/16/13



## MEMORANDUM

**TO:**     Director Bruce R. Ramge (NE), Chair of the Title Insurance (C) Task Force
            Commissioner Ted Nickel (WI), Chair of the Capital Adequacy (E) Task Force

**FROM:** Alan Seeley (NM), Chair of the Title Insurance Risk-Based Capital (C/E) Subgroup

**DATE:** December 13, 2013

**RE:**     Recommendations and Status of Title Insurance Risk-Based Capital (C/E) Subgroup

The Title Insurance Risk Based Capital (C/E) Subgroup of the Title Insurance (C) Task Force and the Capital Adequacy (E) Task Force wishes to advise you that it has ascertained that developing risk-based capital requirements for title insurers is not feasible at this time. We have reached this conclusion for the following reasons:

1. The development of Title RBC would, as an initial condition, require uniform statutory accounting requirements among the states. This is currently not the case, as the accounting standards for statutory premium reserves (SPR) and known claims reserves vary by state. Furthermore, obtaining uniform statutory accounting standards for title reserves would, in our opinion, appear to require the development and inclusion of such standards in a model law (such as a revision of the current *Title Insurers Model Act* (#628)) and that such a model law would need to become an accreditation standard in order to ensure its widespread passage. In light of the difficulties in gaining approval for model law revisions as well as their inclusion in NAIC accreditation standards, we consider this to be highly unlikely.

2. Even if the states were to adopt such uniformity, the amount of work needed to develop an RBC methodology for title insurers would likely exceed the resources of the Subgroup and also would take numerous years to develop. It is worth noting that A.M. Best spent many years developing a version of their capital adequacy ratio (BCAR) for title insurers.

We also wish to advise you that, in an effort to obtain additional tools for monitoring the financial condition of title insurers, we have requested that the Financial Analysis Research and Development (E) Working Group consider the development of IRIS ratios and FAST scores for title insurers.

Since the mission of our Subgroup appears to have been accomplished, we respectfully request permission to disband. Please do not hesitate to contact me at Alan.Seeley@state.nm.us or NAIC staff support Aaron Brandenburg at abrandenburg@naic.org if you have any questions regarding our activities and findings or this request.

W:\National Meetings\2013\Fall\TF\Title\RBCSG\Memo to TF.docx

EXECUTIVE OFFICE • 444 North Capitol Street, NW, Suite 701 • Washington, DC 20001-1509    p | 202 471 3990    f | 816 460 7493
CENTRAL OFFICE • 1100 Walnut Street, Suite 1500 • Kansas City, MO 64106-2197    p | 816 842 3600    f | 816 783 8175
CAPITAL MARKETS & INVESTMENT ANALYSIS OFFICE • 48 Wall Street, 6th Floor • New York, NY 10005-2906    p | 212 382 9000    f | 212 382 4207

www.naic.org

© 2013 National Association of Insurance Commissioners



Our thought was that....

❑ *IF TITLE INSURANCE WAS TRULY "...RELATED TO RISK..." OR INVOLVED THE REDISTRIBUTION OF RISK, TITLE INSURERS WOULD BE REQUIRED TO FILE RBC REPORTS AND BE SO REGULATED. THE OPPOSITE IS TRUE: STATES ROUTINELY **EXCLUDE** TITLE INSURERS FROM THE REQUIREMENTS OF THE RBC SYSTEM:*

No state required RBC reporting from title companies. Forty-eight Insurance Commissioners responded by leading us to the statutory law which excused the *title* insurance comapnies: Alabama: Alabama Code § 27-3-7; Alaska: A.S.A. 21:09.070; Arizona: R.S. § 20-1561(C); Arkansas: Ark. Code Ann. § 23-63-1302(8)(B)(iii); California: RBC not mentioned[12]; Colorado: RBC not mentioned; Connecticut: Insurance Code § 38a-72-1(h); Delaware: Title 18, § 5801(7); Washington D.C.: DC Statutes § 31-2001(10); Florida: Title XXVII, Chapter 624.4085(j); Georgia: Georgia Code § 33-56-1(8); Hawaii: RBC not mentioned; Idaho: Insurers Act § 41-5401(8); Illinois: 215 I.L.C.S. § 5/35A-5; Indiana: Indiana Code

---

[12] Where Risk-Based Capital was shown as "not mentioned", that meant "not found" by Complainant despite diligent search. In any event, the NAIC regulations prevailed and the NAIC does *not* require *title* insurers to file RBC reports.



§ 27-7-3; Iowa: title insurance not allowed; Kansas: RBC not mentioned; Kentucky: 806 K.A.R. 3:190 § 7; Louisiana: La. R.S. 22:6(9); Maine: Title 24-A, M.R.S. § 6451(6-A); Maryland: RBC not mentioned; Massachusetts: 211 C.M.R. § 20.01; Michigan: RBC not mentioned; Minnesota: M.S.A. § 60A.60(8); Mississippi: Miss. Code Ann § 83-5-401(g); Missouri: Title 18 § 5801(7); Montana: M.C.A. § 33-2-1902.210(iii)(b); Nebraska: Stock § 44-214, Risk Based Capital Act C; Nevada: RBC not mentioned; New Hampshire: NH R.S.A. § 416-A; New Jersey: N.J.S.A. § 17:46B-10.1 ; Minnesota: MN Statutes § 60A.60(8);     New York: NY Insurance Law § 1324; North Carolina: RBC not mentioned; North Dakota: RBC not mentioned; Ohio: response delayed; Oklahoma: O.S. Title 365 § 203-5; Oregon: NAIC regulations apply; Pennsylvania: NAIC regulations apply; South Dakota: S.D.C.L. § 58-4-48; Tennessee: TCA § 56-35-112; Texas: 28 TAC § 7.401(a)(2); Utah: RBC not mentioned; Vermont: NAIC regulations apply, Exhibit D; Virginia: VA Risk-Based Capital Act § 8.2-5500; Washington: R.C.W. § 48.05.340; West Virginia: W.Va.Code §33-3-5b; Wisconsin: RBC not mentioned; and Wyoming: W.S. § 26-48-101(a)(iii) & (iv).

-17-